**In re LMS HOLDING COMPANY, an Oklahoma corporation, Debtor.**

**In re PETROLEUM MARKETING COMPANY, an Oklahoma corporation, Debtor.**

**In re RETAIL MARKETING COMPANY, an Oklahoma corporation, Debtor.**

**Bankruptcy Nos. 91–03412–C to 91–03414–C.**

United States Bankruptcy Court, N.D. Oklahoma.

July 1, 1996.

**916**

Thomas A. Creekmore, III, Hall, Estill, Hardwick, Gable, Golden & Nelson, Tulsa, OK, for Debtors.

Josiah M. Daniel, III and C. Mark Brannum, Winstead Sechrest & Minick, P.C., Dallas, TX, for The First National Bank of Boston.

Dennis M. Duffy and Jay P. Golden, Tax Div., U.S. Dept. of Justice, for the Internal Revenue Service.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

STEPHEN J. COVEY, Bankruptcy Judge.

This matter came on to be heard upon the motion of LMS Holding Company, an Oklahoma corporation, Petroleum Marketing Company, an Oklahoma corporation and Retail Marketing Company, an Oklahoma corporation ("Debtors"). The bankruptcy cases of the three Debtors were previously consolidated for joint administration by order of this Court. Debtors seek a partial distribution of approximately $1,000,000.00 of funds in their possession to the First National Bank of Boston and Bank IV Oklahoma, N.A. ("Banks"). The funds at issue are proceeds from the sale of Debtors' assets ("Proceeds")

and would be paid to the Banks in partial payment of their secured claim.

The United States of America, *ex rel.* Internal Revenue Service ("IRS") objects to the distribution of the Proceeds to the Banks. The IRS contends that it has a claim against the Proceeds in the approximate amount of $390,000.00. The IRS further asserts that its claim is secured by a tax lien that is prior in right to the security interest of the Banks. The IRS seeks payment of $390,000.00 before any of the Proceeds are paid to the Banks.

At a hearing on August 25, 1995, this Court with the agreement of the IRS and the Banks, ordered that $600,000.00 of the Proceeds be distributed to the Banks. In addition, the Court reserved ruling on the issue of the distribution of the remaining $400,-000.00 until it could be determined whether the Banks or the IRS had a first priority lien on the remaining Proceeds.

On April 26, 1996, an evidentiary hearing was held to determine the disposition of the remaining $400,000.00. Subsequent to the evidentiary hearing, on May 6, 1996, the Court ordered that the tax lien claim of the IRS was subordinate to the secured claim of the Banks pursuant to Section 724(b)(2) of the Bankruptcy Code. Accordingly, the Court ordered that $350,000.00 of the remaining Proceeds be paid to the Banks with the remaining funds to be reserved for payment of the final costs of administration.

The Court specifically reserved the right to make written findings of fact and conclusions of law in the event the IRS appealed its order. The IRS filed a timely Notice of Appeal. The following are the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

On September 27, 1991, Debtors filed for relief under Chapter 11 of the Bankruptcy Code. At the time of the filing, all Debtors' assets, both real and personal, were subject to a lien in favor of the Banks in the amount of $7,749,284.36. Also at the time of the bankruptcy, the IRS had a claim against Debtors secured by a tax lien in the amount of approximately $390,000.00. The tax lien only attached to certain assets of Debtors

which were acquired from a previous bankruptcy estate known as MAKO ("MAKO"). Some of these assets were still in the possession of Debtors at the time of Debtors' bankruptcy. *In re LMS Holding Co.*, 50 F.3d 1526 (10th Cir.1995).

A portion of the $1,000,000.00 Proceeds which Debtors seeks to distribute to the Banks came from a sale of the assets acquired from MAKO. In order to determine the precise amount of money realized from the MAKO assets, a complicated tracing procedure would have to be performed. Prior to an evidentiary hearing on the tracing issue, the parties stipulated that the Court should determine whether the IRS lien was subordinated to the lien of the Banks pursuant to § 724(b)(2) of the Bankruptcy Code. If the IRS lien is subordinate to the Banks lien, then the Banks have a first priority lien on all of the funds remaining in Debtors' estate. If this is the case, the hearing on the tracing issue will not be necessary.

Debtors' business consisted of operating approximately 77 convenience stores located in several states including Oklahoma, Missouri, and Kansas. The property of Debtors consisted of inventory, equipment, real estate, leasehold improvements, leases, cash, and a licensing agreement with The Southland Corporation ("Southland") authorizing Debtors to operate as 7–Eleven stores.

From the date of filing the petition for relief under Chapter 11, Debtors operated their business and used the proceeds from the sale of the Banks' collateral to fund the operations. On December 18, 1991, the Court entered a cash collateral order authorizing Debtors to use these proceeds and ordered them to made adequate protection payments to the Banks to protect its interest in the collateral. The adequate protection payments were ordered pursuant to §§ 361 and 363(e) of the Bankruptcy Code.

During the period that Debtors operated the business within the Chapter 11, they made adequate protection payments to the Banks in the amount of $395,000.00. On March 18, 1995, Debtors sold all of their assets to an entity known as Contemporary Industries Southern, Inc. ("CIS") for $2,831,030.00. The assets were sold free and clear of all liens and encumbrances with all liens and encumbrances attaching to the proceeds of the sale pursuant to § 363 of the Bankruptcy Code.

The Court previously authorized partial distribution of these proceeds to Southland in the amount of $823,948.46 for unpaid prepetition and postpetition royalties, and to Coastal Refining and Marketing, Inc. ("Coastal") in the amount of $750,000.00 for unpaid postpetition oil and gas purchases. After the payments to Southland and Coastal, approximately $1.2 million remained which has now been reduced to $400,000.00 due to other disbursements authorized by this Court.

Additionally, during the operation of the Chapter 11, the value of the inventory decreased from $1.45 million to $587,000.00. Also, cash on hand was reduced by $128,000.00 and accounts receivable was dissipated by $51,000.00. The Court finds that the value of the Banks' collateral decreased by $2,642,000.00 during the Chapter 11. The Banks received adequate protection payments in the amount of $395,000.00. The Banks also received $400,000.00 from the $1,000,000.00 remaining from the Proceeds. Therefore, the Banks have been paid a total of $995,000.00, and have suffered a loss of $1.64 million in the value of their collateral during the operation of the Chapter 11.

On January 16, 1996, upon the motion of Debtors, this case was converted from Chapter 11 to Chapter 7 pursuant to § 1112 of the Bankruptcy Code. The purpose of the conversion was to allow the Court to distribute the remaining proceeds from the sale of Debtors' assets pursuant to § 724 of the Bankruptcy Code.

## CONCLUSIONS OF LAW

The issue before the Court is whether the lien of the Banks or the lien of the IRS has priority. The following sections of the Bankruptcy Code are applicable. Section 507(b) of the Bankruptcy Code states as follows:

(b) If the trustee, under section 362, 363, 364 of this title, provides adequate protection of the interest of a holder of a claim secured by a lien on property of the debtor and if, notwithstanding such protec-

tion, such creditor has a claim allowable under subsection (a)(1) of this section arising from the stay of action against such property under section 362 of this title, from the use, sale, or lease of such property under section 363 of this title, or from the granting of a lien under section 364(d) of this title, then such creditor's claim under such subsection shall have priority over every other claim allowable under such subsection.

11 U.S.C. § 507(b).

In addition, section 507(a)(1) provides in part:

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under section 503(b) . . .

11 U.S.C. § 507(a)(1).

Also, section 503(b) provides in part as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses . . . including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, . . .

11 U.S.C. § 503(b)(1)(A).

Also, section 724 provides in part as follows:

(b) Property in which the estate has an interest and that is subject to a lien that is not avoidable under this title and that secures an allowed claim for a tax, or proceeds of such property, shall be distributed—

(1) first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such tax lien;

(2) second, to any holder of a claim of a kind specified in section 507(a)(1), 507(a)(2), 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, to the extent of the amount of such allowed tax claim that is secured by such tax lien;

(3) third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien exceeds any amount distributed under paragraph (2) of this subsection;

(4) fourth, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is junior to such tax lien;

11 U.S.C. § 724(b).

Under this statutory scheme, a secured creditor whose lien is inadequately protected and who is prevented from realizing on its lien because of the automatic stay is entitled to a claim for cost of administration pursuant to § 507(a)(1) of the Bankruptcy Code. Additionally, under § 724(b)(2), if a creditor has a § 507(a)(1) cost of administration claim, the claim is paid from the proceeds of the sale of debtor's assets prior to the payment of a tax lien in an amount equal to the amount of the tax lien. After the administrative claim is paid in an amount equal to the tax lien, the balance, if any, is paid to the next junior lien claimant after the tax lien.

In the present case, a distribution pursuant to § 724(b) depletes the entire amount remaining in the estate, which is approximately $350,000.00. Section 724(b) provides that funds be distributed to the Banks in an amount equal to the amount of the tax lien. The amount of the tax lien is $390,000.00. The Banks' cost of administration claim for inadequate protection in the amount of $1.64 million exceeds the $390,000.00 which is the amount of the tax claim. The funds on hand, $350,000.00, are less than the amount of the tax lien, $390,000.00. Accordingly, the Banks' claim fully consumes the amount of the remaining Proceeds or funds on hand.

Other courts have applied this statutory scheme and allowed a § 507(a)(1) cost of administration claim to be paid prior to a claim secured by tax liens. For example, in *In re Bino's Inc.*, 182 B.R. 784 (Bankr. N.D.Ill.1995), the court stated that the operation of § 724(b) provides that priority claimants "step into the shoes of the tax collector." *In re Bino's Inc.*, 182 B.R. at 787 (*quoting* H.R.Rep. 595, 95th Cong., 1st Sess. 382 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6338). In addition, the Court in *In re Bino's Inc.* analyzed the policy behind the statutory scheme:

The policy behind § 724(b) ... is to postpone or subordinate the payment of taxes secured by tax liens for the protection of certain administrative costs and other priority claims. The legislative history indicates that Congress made a policy decision to favor the claims of wage earners, the costs of administration of the estate, and other priority claims over tax liens.

182 B.R. at 787 (citations omitted).

■ Further, the Court in *In re Bino's Inc.* recognized that the distribution contemplated in the Code is mandatory:

Although the precise distribution order of tax liens pursuant to § 724(b) is initially difficult to grasp, there can be no doubt that the purpose of the statute is to subordinate tax liens to the interests of other priority creditors. The subordination of tax liens can result in harsh treatment for taxing authorities, but the congressional intent is clear. "If the statute is clear and unambiguous 'that is the end of the matter, for the court ... must give effect to the unambiguously expressed intent of Congress' ..."

*In re Bino's Inc.,* 182 B.R. at 788;[1] *see also Morgan v. K.C. Mach. & Tool Co. (In re K.C. Mach. & Tool Co.),* 816 F.2d 238 (6th Cir. 1987); *In re Grand Slam U.S.A., Inc.,* 178 B.R. 460 (E.D.Mich.1995); *In re Thurman,* 163 B.R. 95 (Bankr.W.D.Tex.1994); *In re Life Imaging Corp.,* 131 B.R. 174 (Bankr. D.Colo.1991); & *Matter of Cropper Co., Inc.,* 63 B.R. 874 (Bankr.M.D.Ga.1986).

■ The United States Court of Appeals for the Tenth Circuit has recognized that the purpose of adequate protection is to place a secured creditor in the same position at the end of a bankruptcy as it held in the beginning. In the case of *MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393 (10th Cir.1987), the court stated as follows:

The whole purpose in providing adequate protection for a creditor is to insure that

the creditor receives the value for which the creditor bargained prebankruptcy.

808 F.2d at 1396 (citations omitted); *see also United Savings Ass'n v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988); *In re Sun Runner Marine, Inc.,* 134 B.R. 4 (9th Cir. BAP 1991); *In re Colter, Inc.,* 53 B.R. 958 (Bankr.D.Colo.1985).

## CONCLUSION

The Banks' adequate protection in the case presently before the Court failed and the statutory scheme described above and in § 724(b) of the Code must be implemented. Accordingly, the Banks' inadequate protection administrative claim is properly paid ahead of the tax lien.

**IT IS SO ORDERED.**

■

---

1. The court in *In re Bino's* also recognized that there is no difference in the application of § 724(b) in circumstances where a case has been converted from a Chapter 11 to a Chapter 7 case. As stated above, the case presently before this Court has been converted from a Chapter 11 to a

Chapter 7 case. The Court in *In re Bino's* stated that "the relevant language is unequivocal and contains no exceptions for a case converted from Chapter 11 to Chapter 7." *In re Bino's Inc.,* 182 B.R. 784, 788 (Bankr.N.D.Ill.1995).